UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * * * *

| | | |
|---|---|---|
| BONNIE KENDALL, | ) | |
| | ) | |
| Plaintiff, | ) | 3:08-CV-00521-LRH-VPC |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF NEVADA, dba DEPARTMENT | ) | ORDER |
| OF PUBLIC SAFETY, and DOES I-X, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Before the court is Defendant State of Nevada, Department of Public Safety's ("DPS")

Motion for Summary Judgment (#31[1]).  Plaintiff Bonnie Kendall has filed an opposition (#32).

Because it filed its reply late, DPS has filed a "Motion for Leave to Extend Time and File Late"

(#33), attaching its reply as an exhibit.  Plaintiff has filed an opposition (#34) to which DPS replied

(#35)

As a preliminary matter, the court will grant DPS's "Motion for Leave to Extend Time and

File Late" (#33).  In relevant part, Federal Rule of Civil Procedure 6(b)(1) provides that the court

may extend the time to file a motion where the party failed to file the motion because of excusable

---

[1]Refers to the court's docket entry number.

1   neglect. Fed. R. Civ. P. 6(b)(1)(B). In *Pioneer Investment Services Company v. Brunswick*

2   *Associates Limited Partnership*, 507 U.S. 380 (1993), the Supreme Court created a four-part test

3   for determining whether an attorney's late filing is a result of excusable neglect.[2] Thus, in

4   determining whether DPS's delay is excusable here, the court looks to the following factors: (1) the

5   danger of prejudice to Plaintiff; (2) the length of delay and its potential impact on judicial

6   proceedings; (3) the reason for the delay, including whether it was within the reasonable control of

7   DPS; and (4) whether DPS's conduct was in good faith. *See Pincay*, 389 F.3d at 855 (*citing*

8   *Pioneer*, 507 U.S. at 395).

9       The Ninth Circuit has rejected the use of rigid per se rules in the excusable neglect

10  determination. *Id.* at 859. "Rather, the decision whether to grant or deny an extension of time . . .

11  should be entrusted to the discretion of the district court because the district court is in a better

12  position . . . to evaluate factors such as whether the lawyer had otherwise been diligent, the

13  propensity of the other side to capitalize on petty mistakes, the quality of representation of the

14  lawyers . . . , and the likelihood of injustice if the [filing] was not allowed." *Id.* Thus, in *Pincay*,

15  although the Ninth Circuit recognized that a lawyer's "failure to read an applicable rule is one of

16  the least compelling excuses that can be offered," the court nonetheless upheld the district court's

17  finding of excusable neglect where the movant misread the relevant rule and failed to file a timely

18  appeal. *Id.* at 859.

19      Here, DPS counsel filed its reply two days after the time for a reply was due because it

20  misread the local rules. Although DPS's counsel admits that she erred, there is no indication that

21  she acted in bad faith, and because a reply can be expected, the danger of prejudice to Plaintiff is

22

23      [2]Although the Court in *Pioneer* considered the meaning of "excusable neglect" under Federal Rule of
    Bankruptcy Procedure 905(b)(1), the Court also reviewed the various contexts in which the federal rules of

24  procedure use the term and indicated that the same test applies in all contexts. *Pincay v. Andrews*, 389 F.3d
    853, 855 (9th Cir. 2004).

25

1  small.  Indeed, Plaintiff's only challenge to the untimely reply is that the reply discusses an issue

2  not raised in the initial brief.  This argument goes to the substance of DPS's reply and not to

3  whether DPS's counsel's neglect in filing the reply is excusable.[3]  For these reasons, the court finds

4  that DPS's failure to file its reply was a result of excusable neglect.  As a result, the court will grant

5  DPS's Motion to Extend Time (#33) and will consider DPS's reply.

6  **I.    Facts and Procedural History**

7      This is an employment discrimination dispute arising out of Plaintiff's work as a Sergeant

8  with DPS.  Plaintiff began working for DPS in November of 1994, as a Parole and Probation

9  Officer.  In 2006, Plaintiff was assigned to DPS's Training division, where she was the Academy

10  Commander of DPS's Southern Training Academy in Las Vegas, Nevada.

11      **A.    Problems with Trooper Wine**

12      In 2007, Plaintiff and Nevada Highway Patrol Trooper Brad Wine, got into an argument

13  concerning Wine's teaching of a class at the Academy.  During the course of the dispute, Wine told

14  Plaintiff, "Sergeant Kendall, why don't you just sit in here and look pretty and do what you need to

15  do as a woman." (Pl.'s Opp. (#32), Ex. I at 54:21-24.)  Plaintiff immediately reported Wine's

16  statement to her supervisor, Lieutenant James McAfee.

17      The parties dispute how McAfee reacted to Plaintiff's complaint.  Plaintiff testified that

18  McAfee responded with laughter and told her to "have a little bit of thick skin."  (*Id.* at 57:4-6.)

19  He further asked her not to report the incident to Jackie Sandage, the captain, and indicated they

20  should try to solve the problem among themselves.  Because she did not want to interfere with the

21  cadets training, Plaintiff agreed.  In contrast, McAfee testified that when Plaintiff told him about

22

23      [3]The court agrees with DPS that it raised the disputed argument concerning the statute of limitations

24  in direct response to Plaintiff's attempt in her opposition to raise issues of fact by referencing various incidents
    that occurred in the 1980s and 1990s.  Accordingly, the court will not permit Plaintiff to file a response.

25

1    the incident with Wine, he told her to "kick Brad Wine out of the building." (*Id.*, Ex. K at 71:16-

2    72:3.) He further testified that he reported the incident to his supervisor.

3         It is undisputed that on February 9, 2007, Plaintiff reported Wine's inappropriate comments.

4    Kimberly King, Personnel Officer for DPS, was informed of Plaintiff's complaint. King spoke

5    with Plaintiff and advised her of the options available, including having the Nevada Department of

6    Personnel investigate her complaint or having DPS conduct an internal investigation. Captain

7    Sandage was present at the meeting and testified that King suggested to Plaintiff that she have the

8    incident investigated internally. (Pl.'s Opp. (#32), Ex. O at 73:17-74:3.)

9         Plaintiff agreed to have the matter investigated internally, and on February 15, 2007,

10    Plaintiff requested a round table meeting to discuss her complaint. The meeting was held on

11    February 26, 2007. The parties dispute whether the meeting resolved the dispute to Plaintiff's

12    satisfaction.

13         Plaintiff alleges, in retaliation for her speaking out, the Nevada Highway Patrol ("NHP")

14    ceased using the DPS Academy for in-service training and stopped sending NHP training officers

15    to the Academy. Plaintiff further alleges that DPS ratified NHP's "sabotage" by failing to get the

16    NHP personnel to return to the Academy.

17         **B.    Problems with Lieutenant McAfee**

18         Plaintiff testified that, in 2006, when she was applying for the position at DPS, the chief at

19    the time, Perry, said to her, "You are close to middle age, you are not the typical hottie who is

20    going to sleep with the cadets." (*Id.*, Ex. I at 155:3-5.) When Chief Perry stated that he had

21    concerns about the other woman being considered for the job, McAfee looked at Plaintiff and said,

22    "Yeah, I want [the other woman] over here." (*Id.*, Ex. I at 155:6-8.)

23         Plaintiff also testified that after the incident with Wine, her relationship with McAfee

24    deteriorated. Plaintiff testified that following the Wine incident, in 2007, McAfee threatened to

25

4

1   replace her at least three times.[4]  In addition, McAfee disliked Chief Jackie Sandage, and Plaintiff

2   testified that McAfee "talked so disparagingly about Jackie Sandage, almost on a daily basis he

3   called her a fucking cunt, a bitch." (Pl.'s Opp. (#32), Ex. I at 220:9-11.)  While McAfee admitted

4   to referring to Captain Jackie Sandage as a "fucking bitch," he testified that he did so on only one

5   occasion.  (Id., Ex. K at 70:6-7.)

6          Plaintiff further testified that McAfee told her he goes to Las Vegas, Nevada to "get blow

7   jobs because his wife and he [were] having problems because his wife was constantly having affairs

8   and it was always sexual in nature.  And then his penis was the size of a water bottle and things like

9   that." (Pl.'s Opp. (#32), Ex. I at 119:17-21.)  McAfee denies making the water-bottle statement

10  and testified that he only discussed his marital issues with Plaintiff on one occasion.

11         Although DPS never investigated McAfee's conduct, sometime in 2008, DPS removed

12  McAfee from Plaintiff's chain of command.

13         **C.    Promotions**

14         Plaintiff alleges that DPS retaliated against her for speaking out against the alleged

15  discrimination by refusing to promote her.  On June 27, 2005, DPS opened the "DPS promotional

16  recruitment" to establish a hiring list to fill current and future vacancies throughout DPS.  (Def.'s

17  Mot. Summ. J. (#31, Ex. 4 at 533.)  On May 15, 2006, a hiring list was certified for the Division of

18  Parole and Probation, and Plaintiff ranked sixth on the list.  On May 17, 2006, she was contacted

19  for an interview, but she declined to participate in the interview.

20         On May 22, 2006, another hiring list was certified for the Highway Patrol Division to fill a

21  vacancy in Las Vegas, Nevada and a vacancy in Elko, Nevada.  Again, Plaintiff ranked sixth on the

22

23         [4]In addition, Plaintiff stated that McAfee issued Plaintiff two "letters of instruction," but it is not clear
24  from Plaintiff's deposition testimony when that occurred.

25

1  hiring list.  On May 25, 2006, she was contacted, but she declined to interview for the vacant

2  positions.

3         On May 30, 2006, DPS posted another job announcement for a lieutenant position.  Sixty-

4  seven applicants applied, and of those applicants, sixty met the minimum qualifications for the

5  position.  Based on a Training and Experience Rating Plan, fifty-eight applicants were certified on

6  the first hiring list.  The next stage of the selection process consisted of an interview before a three-

7  member panel that asked the same set of pre-determined questions.  At the time of the interviews,

8  DPS had four vacant lieutenant positions.  Plaintiff interviewed for the vacancies, but ultimately

9  was not selected.  Of the four people selected, one was a woman.

10        In May of 2007, DPS posted an opening for the Training Division Administrator.  DPS

11  received fourteen resumes.  DPS Director Phillip Galeoto reviewed the resumes and selected four

12  candidates he believed were most qualified.  It is not clear whether Plaintiff applied for this

13  position.  Assuming that she did, she was not among the four selected for an interview.  DPS

14  ultimately selected Lieutenant Julie Johnson of the Parole and Probation Division to fill the

15  position.

16        On June 25, 2007, DPS posted an opening in the Division of Parole and Probation in

17  Carson City and Reno, Nevada.  The selection process mirrored the selection process of the May,

18  2006, lieutenant openings.  Plaintiff, along with approximately twenty-four other individuals

19  interviewed for the position.  Because of her performance at the interview, Plaintiff was not among

20  those recommended to fill the positions.

21        Finally, Plaintiff testified that in 2008, she applied for a lieutenant position and was not

22  selected.

23        **D.    Additional Instances of Harassment**

24  Plaintiff testified that in 1995, her supervisor asked to see her breasts.  When she told him

25

6

1   she was going to report the incident, he allegedly told her that if she did so, she would not "go

2   anywhere" in the agency.  (Pl.'s Opp. (#32), Ex. I at 34:5-9.)  Plaintiff further testified that in 1996

3   or 1997, a lieutenant referred to women as "split tails."  When she reported the incident, her

4   supervisor told her she needed to "shut up if [she] wanted to ever have an opportunity to go

5   anywhere . . . ." (*Id.* at 35:13-18.)  Plaintiff also testified that several other DPS employees hit on

6   her during the 1990s.  Plaintiff was told "many times" during the 1980s and 1990s that she "should

7   be in bed between the sheets." (*Id.* at 42:7-9.)

8           Lieutenant McAfee testified that in December of 2004, or January of 2005, he heard former

9   Chief Hosmer say, in front of the new personnel chief, that he did not believe women should be in

10  law enforcement.  (Pl.'s Opp. (#32), Ex. K at 16:18-17:7.)

11          Plaintiff also testified that in 2005, after a meeting during which Plaintiff questioned the

12  promotion process, the former director of DPS, Tom Togliatti, grabbed Plaintiff's badge, which

13  was hanging around her neck, and said, "Bonnie Kendall, I'll remember that name when

14  promotions come up." (Pl.'s Opp. (#32), Ex. I at 164:21-165:2.)  Plaintiff did not report the

15  incident.

16          Thomas Nelson, an administrative assistant with DPS, testified that on May 30, 2006, he

17  attended dispatcher training.  Nelson and seven women attended the class. The trainer cautioned the

18  dispatchers that the police officers would use crass language in speaking with them.  In particular,

19  the trainer said the dispatchers would be called a "stupid bitch" and a "whore."  (Pl.'s Opp. (#32),

20  Ex. N at 16:2-5.)  The trainer further indicated that although the dispatchers could report the

21  conduct, nothing would come of their reports.

22          Finally, Plaintiff testified that the work environment at the training division was "so

23  uncomfortable . . . that [she] felt for her mental health it was best for [her] to get out of the Las

24  Vegas area . . . ." (Pl.'s Opp. (#32), Ex. I at 30:23-31:1.)  Thereafter, Plaintiff transferred to the

25

7

1    DPS office in Elko, Nevada.

2              **E.    Charge of Discrimination**

3              In August of 2007, Plaintiff filed a charge of discrimination with the Nevada Equal Rights

4    Commission.  In the complaint Plaintiff alleged that, beginning on January 1, 2007, Trooper Wine,

5    Former Director Togliatti, Personnel Chief King, Colonel Perry, Senior Deputy Attorney General

6    Quinn, and Lieutenant McAfee discriminated against her because of her age and gender.  In

7    particular, Plaintiff alleged she was subject to discrimination when Wine (1) told her to "sit in

8    [your] office and look pretty" and (2) several days later, said to her, "I see you are not in your

9    office," and suggested that she not worry about the cadets because he would take care of them.

10   (Def.'s Mot. Summ. J. (#31), Ex. 5.)  She further alleged she was passed over for a promotion in

11   retaliation for her filing an internal complaint against Wine.

12   **II.    Legal Standard**

13             Summary judgment is appropriate only when "the pleadings, depositions, answers to

14   interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

15   genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

16   law." Fed. R. Civ. P. 56(c).  In assessing a motion for summary judgment, the evidence, together

17   with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable

18   to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

19   587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

20             The moving party bears the burden of informing the court of the basis for its motion, along

21   with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*,

22   477 U.S. 317, 323 (1986).  On those issues for which it bears the burden of proof, the moving party

23   must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could

24   find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.

25

1  1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

2  　　　　To successfully rebut a motion for summary judgment, the non-moving party must point to

3  facts supported by the record which demonstrate a genuine issue of material fact. *Reese v.*

4  *Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might

5  affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

6  242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary

7  judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute

8  regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could

9  return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a

10  scintilla of evidence in support of the plaintiff's position will be insufficient to establish a genuine

11  dispute; there must be evidence on which the jury could reasonably find for the plaintiff. *See id.* at

12  252.

13  **III.    Discussion**

14  　　　　Plaintiff asserts the following claims for relief: (1) hostile work environment; (2) gender

15  discrimination; and (3) retaliation. DPS seeks summary judgment with regard to each of these

16  claims.

17  　　　　**A.    Statute of Limitations**

18  　　　　As a preliminary matter, the court must determine which acts Plaintiff may rely on in

19  support of her claims. In her opposition, Plaintiff identifies alleged instances of harassment and

20  discrimination dating back into the 1980s. DPS argues Plaintiff cannot base her claims on many of

21  these instances because they are barred by the statute of limitations.

22  　　　　Under 42 U.S.C. § 2000e-5(e)(1), where a plaintiff institutes proceedings with a state

23  agency, the plaintiff must file a charge of discrimination with the Equal Employment Opportunities

24  Commission within 300 days "after the alleged unlawful employment practice occurred . . . ." 42

25

1   U.S.C. § 2000e-5(e)(1).  "A claim is time barred if it is not filed within [this] limit."  *Nat'l R.R.*

2   *Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).

3          When an act "occurred" for purposes of Title VII varies depending on the type of claim.

4   *Morgan*, 536 U.S. at 110.  The court will consider each claim relevant to this case below.

5                     **1.       Discrimination and Retaliation**

6          For discrimination and retaliation claims, the time for filing a charge of discrimination with

7   the EEOC begins when the discriminatory or retaliatory act occurs.  *Id.* at 113.  Thus, where a

8   complaint alleges discrimination based on discrete acts outside of the statutory time period, the

9   occurrence of additional discrete acts within the statutory time period does not make those previous

10  acts timely.  Id. at 111.  In *Morgan*, the Supreme Court held, "[D]iscrete discriminatory acts are not

11  actionable if time barred, even when they are related to acts alleged in timely filed charges."  *Id.* at

12  113.  The Court further noted, "the existence of past acts and the employee's prior knowledge of

13  their occurrence . . . does not bar employees from filing charges about related discrete acts so long

14  as the acts are independently discriminatory and charges addressing those acts are themselves

15  timely filed."  *Id.*  In addition, an employee may use the prior acts as background evidence in

16  support of a timely claim.  *Id.*

17         Here, as to Plaintiff's retaliation and discrimination claims, Plaintiff alleges she suffered

18  numerous discriminatory and retaliatory acts from the 1980s through her move to Elko, Nevada,

19  sometime in 2008.  Plaintiff filed her charge on August 7, 2007.  Because only discrete acts that

20  took place within the timely filing period are actionable, only those acts that occurred 300 days

21  before August 7, 2007, are actionable.  In other words, Plaintiff can assert retaliation and

22  discrimination claims based on incidents that occurred between October 11, 2006, and August 7,

23  2007.  During this time period, Plaintiff alleges Wine and McAfee made discriminatory comments

24  to her.  She further alleges she was retaliated against for complaining about the discriminatory

25

                                                   10

1    comments in the following two ways: (1) DPS failed to rectify NHP's "boycott" of the Academy

2    and (2) she was wrongfully denied promotions.  All prior discrete acts are untimely and no longer

3    actionable.

4          Nonetheless, Plaintiff argues her discrimination and retaliation claims are not based on

5    "discrete" acts.[5]  Thus, it appears that Plaintiff is now trying to classify her claims as "pattern-or-

6    practice" discrimination claims.  In *Morgan*, the Court noted that it had "no occasion . . . to

7    consider the timely filing question with respect to 'pattern-or-practice' claims brought by private

8    litigants . . . ." 536 U.S at 115 n.9. Since *Morgan*, neither the Supreme Court nor the Ninth Circuit

9    has addressed how courts should apply Title VII's statute of limitations to pattern-or-practice

10    claims based on a series of discriminatory acts, some of which occurred outside the limitations

11    period.

12          Regardless, the court doubts whether DPS's conduct is properly analyzed under the

13    "pattern-or-practice" framework.  "[P]attern-or-practice claims cannot be based on 'sporadic

14    discriminatory acts' but rather must be based on discriminatory conduct that is widespread

15    throughout a company or that is a routine and regular part of the workplace." *Cherosky v.*

16    *Henderson*, 330 F.3d 1243, 1247 (9th Cir. 2003) *(quoting Int'l Bhd. of Teamsters v. United States*,

17    431 U.S. 324, 336 (1977)).  Thus, to demonstrate a prima facie case of pattern-or-practice

18    discrimination, the plaintiff must establish by "a preponderance of the evidence that . . .

19    discrimination was the company's standard operating procedure – the regular rather than the

20    unusual practice." *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984) (internal

21

22          [5]Plaintiff raises this argument in her opposition (#34) to DPS's Motion for Leave to Extend Time and

23    File Late (#33), where she maintains that DPS improperly raised the statute of limitations argument in its reply, preventing Plaintiff from responding.  DPS counters that it raised the statute of limitations question in direct

24    response to Plaintiff's inclusion in her opposition of numerous statements and incidents occurring during the course of her over twenty-year career with DPS.

25

1  quotation marks and citation omitted).

2      Here, Plaintiff's complaint does not allege a pattern-or-practice claim, and instead focuses

3  on discrete acts of discrimination.  In addition, Plaintiff has not presented the type of statistical

4  evidence generally used to demonstrate a pattern or practice of discrimination.  *See See Lyons v.*

5  *England*, 307 F.3d 1092, 1107 n.8 (9th Cir. 2002) (citations omitted) (noting that generally, to

6  demonstrate pattern or practice of discrimination, plaintiff will use statistical evidence of

7  employer's past treatment of the protected group and testimony from protected class members

8  outlining specific instances of discrimination).

9      Moreover, most pattern-or-practice claims are brought by the EEOC or, if private, as class

10 actions.  *See Lowery v. Circuit City Stores*, 158 F.3d 742, 759-60 (4th Cir. 1998), *vacated on other*

11 *grounds*, 527 U.S. 1031 (1991).  "[T]he [Supreme] Court has noted that there is a 'manifest' and

12 'crucial' difference between an individual's claim of discrimination and a class action alleging a

13 general pattern or practice of discrimination."  *Id.* at 761 (*quoting Cooper*, 467 U.S. at 876).  As a

14 result, circuit courts addressing the issue have held that because a pattern-or-practice theory is

15 focused on establishing a policy of discrimination and not individual decisions affecting a specific

16 plaintiff, such a theory is "inappropriate as a vehicle for proving discrimination in an individual

17 case."  *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 564, 575 (6th Cir. 2004); *see also Celestine v.*

18 *Petroles de Venezuela SA*, 266 F.3d 343, 356 (5th Cir. 2001); *Lowry*, 158 F.3d at 762 ("individuals

19 do not have a private, non-class cause of action for pattern-or-practice discrimination under § 1981

20 or Title VII"); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 866 n.6 (7th Cir. 1985) ("Plaintiffs' use

21 of 'pattern-or-practice' language also seems misplaced, since such 'suits, by their very nature,

22 involve claims of classwide discrimination . . . .")

23     Likewise, Plaintiff cannot avoid the statute of limitations by arguing that the discrete acts

24 were undertaken pursuant to a discriminatory policy.  *See Cherosky*, 330 F.3d at 1247 (*citing*

25

12

1   *Lyons*, 307 F.3d at 1107-08).  In *Cherosky*, the court noted, "[The] plaintiff's assertion that this

2   series of discrete acts flows from a company-wide, or systematic, discriminatory practice will not

3   succeed in establishing the employer's liability for acts occurring outside the limitations periods

4   because the Supreme Court has determined that each incident of discrimination constitutes a

5   separate actionable unlawful employment practice." *Id.* (quoting *Lyons*, 307 F.3d at 1107).  "Thus,

6   a discriminatory practice, though it may extend over time and involve a series of related acts,

7   remains divisible into a set of discrete acts, legal action on the basis of each of which must be

8   brought within the statutory limitations periods." *Id.* (quoting *Lyons*, 307 F.3d at 1107).

9          Accordingly, the court finds that Plaintiff's allegations of discrimination are best

10  characterized as discrete acts rather than as a pattern or practice of discrimination.  Plaintiff must

11  base her discrimination and retaliation claims only on discrete acts that took place within the timely

12  filing period.  As Plaintiff filed her charge on August 7, 2007, only those acts that occurred 300

13  days before August 7, 2007, or between October 11, 2006, and August 7, 2007, are actionable.  All

14  claims based on prior discrete acts are untimely.

15                    **2.      Hostile Work Environment**

16         Unlike discrete discrimination and harassment claims, hostile work environment claims are

17  based on the "cumulative affect of individual acts."  *Morgan*, 536 U.S. at 115.  As a result, these

18  claims necessarily involve allegations of repeated conduct.  *Id.*  For a hostile work environment

19  claim, it does not matter that some of the events supporting the claim occurred before the statutory

20  time period.  *Id.* at 117.  "Provided that an act contributing to the claim occurs within the filing

21  period, the entire time period of the hostile environment claim may be considered by a court for the

22  purposes of determining liability."  *Id.*

23         "A court's task is to determine whether the acts about which an employee complains are

24  part of the same actionable hostile work environment practice, and if so, whether any act falls

25                                    13

within the statutory time period." *Id.* at 120.  To determine whether conduct is a part of the same unlawful employment practice, the court considers whether the conduct was "'sufficiently severe or pervasive,' and whether the earlier and later events amounted to the 'same type of employment actions, occurred relatively frequently, or were perpetrated by the same managers.'" *Porter v. Cal. Dep't Corr.*, 419 F.3d 885, 893 (9th Cir. 2005) (*quoting Morgan*, 536 U.S. at 116, 120).

The Ninth Circuit's decision in *Porter* is demonstrative.  There, in 1995 or 1996, two employees, Wheeler and DeSantis, sexually propositioned a female employee and made offensive comments to her.  419 F.3d at 893.  The following year, Wheeler ate and then spat in the plaintiff's food, and in 1998, Wheeler referred to her as a "fucking bitch."  *Id.*  In addition, in 1996, DeSantis referred  to the plaintiff as a "whore" and, in 1998, glared at her during the course of an investigation into his conduct.  *Id.*  Finally, in 1998, another employee made various angry remarks to the plaintiff, and, in 2001 unnamed employees yelled insults and obscenities at the plaintiff.  *Id.*

The court found that only Wheeler and DeSantis' conduct was a part of the same hostile work environment practice.  The court reasoned that the angry remarks made to the plaintiff in 1998, and the yelling of insults in 2001, were not a part of the same hostile work environment practice as the conduct of Wheeler and DeSantis because there was no evidence linking these comments to Wheeler and DeSantis' actions.  *Id.*  However, the conduct of Wheeler and DeSantis was a part of a single hostile work environment practice primarily because their actions involved the "same type of sexist activity; to wit, intimidating or demeaning the value of female employees who do not submit to demands for sexual favors."  *Id.* at 894  As a result, the court concluded that, even though some of the incidents took place outside of the statutory period, the plaintiff could rely on all of Wheeler and DeSantis' actions in support of her hostile work environment claim.  *Id.*

Here, Plaintiff has specifically identified the following conduct as supporting her hostile work environment claim: (1) McAfee's "almost daily" references to Captain Sandage as a "fucking

14

bitch," "fucking cunt," and other demeaning names allegedly in response to her opposition to sexual harassment; (2) McAfee's comparison of his penis to a water bottle; and (3) DPS's failure to respond to the Highway Patrol's "boycott" of the training academy after Wine told Plaintiff to "sit in [in your office] and look pretty and do what you need to do as a woman."  (Pl.'s Opp. (#32), Ex. I at 54:21-24).  Plaintiff's evidence further indicates that (1) in 1995, a supervisor asked to see her breasts, (2) in 1996 or 1997, a lieutenant referred to women as "split tails," (3) several times during the 1990s, DPS employees hit on her, and, (4) during the 1980s and 1990s, she was told "many times" that she "should be in bed between the sheets."

As McAfee's comments and the incident with Wine took place within the filing period, the question is whether, in asserting her hostile work environment claim, Plaintiff may also rely on the additional incidents that took place well before the filing period.  Plaintiff does not allege that either McAfee or Wine made the identified derogatory comments in the 1980s and 1990s, and there is no evidence linking McAfee or Wine to the comments.  Further, the comments appear to have been made sporadically over a period of more than ten years.  Under these facts, the court cannot find that the conduct Plaintiff complains of constitutes "one unlawful employment practice."  *See Morgan*, 536 U.S. at 117; *Porter*, 419 F.3d at 893.  Accordingly, these instances are time-barred.

Having defined the scope of Plaintiff's actionable claims, the court will now address the merits of each claim.

**B.    Discrimination**

Plaintiff alleges DPS discriminated against her on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17.  Section 2000e–2(a)(1) of Title VII  makes it an unlawful employment practice to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2. Sexual harassment

is a species of gender discrimination and thus constitutes a violation of Section 2000e-2.  *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000).

To prevail, the plaintiff must establish a prima facie case of discrimination by presenting evidence that "gives rise to an inference of unlawful discrimination."  *Cordova v. State Farm Ins. Co.*, 124 F.3d 1145, 1148 (9th Cir. 1997); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).   A plaintiff can establish a prima facie case of discrimination through either the burden shifting framework set forth in *McDonnell Douglas* or with direct or circumstantial evidence of discriminatory intent.   *See Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007) ("When responding to a summary judgment motion . . . [the plaintiff] may proceed using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer].") (citation omitted) (alterations in original).

The plaintiff carries the initial burden of establishing a prima facie case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802.  To establish a prima facie case of disparate treatment discrimination, Plaintiff must show that (1) she belongs to a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) similarly situated individuals outside of her protected class were treated more favorable.  *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (*citing Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1126 (9th Cir. 2000)).  If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct.  *McDonnell Douglas*, 411 U.S. at 802.  If the defendant provides such a justification, the burden shifts back to the plaintiff to show that the defendant's justification is a mere pretext for discrimination.  *Id.* at 804.

DPS does not dispute that Plaintiff, as a woman, is a member of a protected class or that

16

1  Plaintiff was performing her job satisfactorily.  Therefore, Plaintiff has made a sufficient showing

2  as to the first two elements of a prima facie discrimination claim.

3        With regard to the third element, "[f]or purposes of a disparate treatment claim, an adverse

4  employment action is one that materially affects the compensation, terms, conditions, or privileges

5  of employment." *Davis*, 520 F.3d at 1089.  "[H]iring, firing, failing to promote, reassignment with

6  significantly differently responsibilities, or a decision causing a significant change in benefits" are

7  adverse employment actions. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (citations

8  omitted).

9        Plaintiff alleges that she suffered an adverse employment action in two ways.[6]  First, she

10  alleges she suffered an adverse employment action when DPS permitted NHP to boycott the

11  academy.  However, no evidence before the court indicates that the NHP's boycott materially

12  affected the compensation, terms, conditions, or privileges of Plaintiff's employment.  While

13  Plaintiff appears to have been upset about the boycott, the boycott neither significantly affected

14  Plaintiff's job responsibilities nor had any impact on Plaintiff's benefits.  As such, the court finds

15  that, as a matter of law, the boycott was not an adverse employment action.

16        Plaintiff also argues, and DPS does not dispute, that DPS's failure to promote her was an

17  adverse employment action. Thus, the only remaining question is whether issues of fact remain

18  concerning DPS's treatment of similarly situated males during the promotions process.  DPS argues

19  that of the two promotions Plaintiff pursued, one woman was ultimately hired.  DPS further notes

20  that Plaintiff applied for a chief position when she was only a sergeant, which would have required

21  her to skip the lieutenant position.  Moreover, DPS notes that it hired a female to fill the chief

22  position.

23

24       [6]Although Plaintiff identifies additional instances of alleged discrimination, as discussed above, the statute of limitations bars these claims.

25

17

In her opposition, Plaintiff fails to cite any evidence suggesting that she was not promoted because of her gender or that similarly situated male individuals were treated more favorably.[7] Indeed, Plaintiff has not cited information concerning the qualifications of those individuals selected to fill the positions to which Plaintiff applied.  Accordingly, the court will grant summary judgment as to Plaintiff's gender discrimination claim.

**C.   Retaliation**

Plaintiff alleges DPS retaliated against her for complaining about discrimination and harassment at DPS.  Under Section 2000e-3(a) of Title VII, it is unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII ], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

To establish a prima facie case of retaliation, a plaintiff must demonstrate that "(1) she engaged in an activity protected under title VII; (2) her employer subjected her to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action."  *Thomas v. City of Beaverton*, 379 F.3d 802, 811 (9th Cir. 2004) *(citing Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000)).  If a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to demonstrate a legitimate, nondiscriminatory reason for its decision.  *Ray*, 217 F.3d at 1240.  If the defendant demonstrates such a reason, the burden shifts back to the plaintiff to show that the defendant's reason was a mere pretext for a discriminatory motive.  *Id.*

---

[7]There is evidence suggesting that DPS has an alternative promotions process known as "NPD-19" whereby some individuals are allowed to bypass the regular promotions process.  However, no evidence in the record suggests that women were not permitted to utilize the alternative process.

1    DPS does not dispute that Plaintiff engaged in a protected activity under Title VII when she

2    complained about Wine and McAfee's statements.  In addition, DPS does not dispute that

3    Plaintiff's denial of a promotion is an adverse employment action.  Instead, DPS argues that

4    Plaintiff cannot show a causal connection between her denial of promotion and her complaints.

5    Indeed, Plaintiff provides no evidence of a casual connection.  For example, while Plaintiff states

6    that McAfee sat on promotional boards, there is no evidence indicating that McAfee was involved

7    in anyway in the promotion decisions concerning Plaintiff.  There is also no evidence suggesting

8    that McAfee's reviews of Plaintiff's work performance affected the hiring decisions.

9        Plaintiff also appears to argue that DPS retaliated against Plaintiff for reporting harassment

10   by subjecting her to a hostile work environment.  In *Ray v. Henderson*, the court found that a

11   hostile work environment may be the basis for a retaliation claim under Title VII.  217 F.3d 1234,

12   1245 (9th Cir. 2000).  However, here, as discussed below, Plaintiff has failed to identify factual

13   issues concerning whether the environment was sufficiently severe and pervasive as to alter the

14   conditions of her employment and create an abusive working environment.  As such, summary

15   judgment is also warranted for Plaintiff's retaliation claim based on a hostile work environment.

16       **D.    Hostile Work Environment**

17       Although not explicitly included in the text of Title VII, claims based on a hostile work

18   environment fall within Title VII's protections. *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993). To

19   survive summary judgment on a claim based on a hostile work environment, "a plaintiff must show

20   that: (1) she was subjected to verbal or physical conduct of a sexual nature; (2) the conduct was

21   unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her

22   employment and create an abusive work environment." *Porter*, 419 F.3d at 892 (*citing Vasquez v.*

23   *County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2004)).  "Harassing conduct need not be

24   motivated by sexual desire to support an inference of discrimination." *Kortan v. Cal. Youth Auth.*,

25

1   217 F.3d 1104, 1110 (9th Cir. 2000) (citation omitted).  Instead, a "general hostility to the presence

2   of women in the workplace" is sufficient.  *Id.* (citation omitted).

3         In addition, the "working environment must both subjectively and objectively be perceived

4   as abusive."  *Fuller v. City of Oakland, California*, 47 F.3d 1522, 1527 (9th Cir. 1995) (*citing*

5   *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)).  To determine if the workplace is objectively

6   hostile, courts examine the issue from the perspective of a reasonable person with the same

7   fundamental characteristics as the claimant.  *Id.*  Key factors in determining whether a work

8   environment is hostile include (1) the frequency of the conduct; (2) the severity of the conduct; (3)

9   whether the conduct is physically threatening or humiliating, as opposed to a mere utterance; and

10  (4) whether the conduct unreasonably interferes with an employee's work performance.  *Harris*,

11  510 U.S. at 23.

12        DPS primarily challenges Plaintiff's ability to demonstrate the third element of a hostile

13  work environment claim.  To determine whether conduct was sufficiently severe or pervasive to

14  violate Title VII, the court considers "all the circumstances, including the frequency of the

15  discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

16  offensive utterance; and whether it unreasonably interferes with an employee's work performance."

17  *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001) (citation and internal quotation

18  marks omitted).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely

19  serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"

20  *Id.* at 271 (citation omitted).  The ultimate question is whether a reasonable woman would consider

21  the conduct sufficiently severe or pervasive to alter the conditions of employment and create an

22  abusive working environment.  *Ellison v. Brady*, 924 F.2d 872, 879 (9th Cir. 1991).

23        In arguing that the conduct at issue in this case is not sufficiently severe or pervasive to alter

24  the conditions of Plaintiff's employment, DPS relies on the Ninth Circuit's decision in *Kortan v.*

25

1   *California Youth Authority*, 217 F.3d 1104 (9th Cir. 2000), and the district court's decision in

2   *Watson v. Las Vegas Valley Water District*, 378 F. Supp. 2d 1269 (D. Nev. 2005), *aff'd on other*

3   *grounds*, 268 Fed. Appx. 624 (9th Cir. 2008).

4        In *Kortan*, during a meeting with the plaintiff, the plaintiff's supervisor referred to various

5   females in the office as "regina," "madonna," or "castrating bitch," and referred to women

6   generally as "bitches" and "histrionics." 217 F.3d at 1106-07. After the plaintiff complained about

7   her supervisor's conduct, he referred to her as "Medea." *Id.* at 1107. The court held that the

8   conduct was not frequent, severe, or abusive enough to support a claim for hostile work

9   environment. *Id.* at 1111.

10        In *Watson*, the plaintiff endured a co-worker's sexually-explicit dialogue directed at her for

11   over twenty minutes. 378 F. Supp. 2d at 1272. In addition, one of the plaintiff's supervisors

12   approached her and placed both of his hands on her shoulders while whispering in her ear and

13   another supervisor approached the plaintiff from behind and whispered that two employees at the

14   site were lovers. *Id.* at 1272-73. The court found that this conduct was not sufficiently severe or

15   pervasive to alter the conditions of the plaintiff's employment and create an abusive working

16   environment. Id. at 1276-77.

17        Viewed in the light most favorable to Plaintiff, the evidence indicates that Plaintiff's

18   supervisor repeatedly referred to another of Plaintiff's female supervisors in sexually derogatory

19   terms and compared his penis to a water bottle. In addition, Plaintiff was once told to sit in her

20   office and "look pretty" while another male co-worker handled a work situation.

21        The court finds that this conduct does not rise to the level of severity or pervasiveness

22   required to support a hostile work environment claim. The events cited by Plaintiff, while

23   offensive, are not threatening and appear to be isolated and offhand incidents. In sum, the instances

24   Plaintiff identifies are not the type of conduct that the Ninth Circuit has found to be so severe and

25

pervasive as to alter the conditions of employment.  *See, e.g., Davis v. Team Elec. Co.*, 520 F.3d 1080 (9th Cir. 2008) (finding female employee demonstrated material issues of fact concerning the severity of supervisors' conduct where, over the course of nearly one year, supervisors stated, "[w]e don't mind if females are working as long as they don't complain," indicated certain food brought to work was only for the guys, referred to their wife as "astrobitch," told plaintiff a foreman needed a girlfriend, told plaintiff not to go into a trailer even though male employees were permitted to enter, and stated, "this is a man's working world out here, you know"); *Craig v. M&O Agencies, Inc.*, 496 F.3d 1047 (9th Cir. 2007) (finding female employee had stated prima facie case for hostile work environment where her supervisor made repeated comments over several months about her legs, followed her into a female restroom and kissed her, and, on at least four other instances, made inappropriate comments, including comments about having sexual relations with her); *Ellison*, 924 F.2d 872 (finding female employee stated claim for hostile work environment where co-worker sent her two letters stating that he had been "watching" and "experiencing" her, making repeated references to sex, and indicating he would write again).

        The cases Plaintiff cites are not to the contrary.  For example, Plaintiff asserts that her case is analogous to the case presented in *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104 (9th Cir. 1998).  There, a female employee alleged that over a two year period her supervisor made sexual remarks about her, often referred to her as "beautiful" and "gorgeous," told her about his sexual fantasies, including having sex with both the plaintiff and his wife, joked that a Mexican prostitute is called a "frijole," made comments about her "ass" and commented to others that "it would be fun to get into [her] pants," used the loudspeaker to ask whether she needed help changing out of her wet clothes and, on another occasion asked whether she was going to take off more than her sweatshirt, and walked up to her from behind and told her to "be careful who you bend over in front of."  *Id.* at 1105-06.  The plaintiff reported this conduct several times, but nothing was done.  When

1  she confronted the supervisor directly, while she was still in his office, the supervisor called his

2  own supervisor, laughed, and said she was "digging up old bones." *Id.* at 1106.

3      The court found that, although only the instance in her supervisor's office took place within

4  the limitations period, the district court should nonetheless consider the earlier events. *Id.* at 1109.

5  The court stated,

6          Draper has described an occurrence that can only be understood in light of the
        circumstances that preceded it and the nature of the relationship that existed between

7          Draper and her supervisor . . . [The supervisor's] snide laugher and humiliating
        response . . . could reasonably have been perceived . . . as an act of hostility . . . related

8          to the authority he customarily exercised over her and to his prior, as well as future,
        discriminatory treatment of her. *Id.*

9

10  *Id.*

11      Plaintiff argues that, as in *Draper*, by permitting NHP to boycott the Academy, DPS

12  perpetuated its "sexual harassment culture" and sent the message to Plaintiff that the "chances that

13  management would take appropriate corrective action were slim to none." (Pl.'s Opp. (#32) at 18-

14  19.)  However, even when the court considers DPS's response to the boycott in light of the

15  previous instances alleged by Plaintiff, the court's decision in *Draper* does not compel the court to

16  find that there are issues of fact concerning the severity and pervasiveness of the conduct at issue

17  here.  First, it is important to note that, in *Draper*, the court held that the district court erred in

18  finding the plaintiff's hostile work environment claim time-barred because the district court should

19  have considered all of the instances of harassment identified by the plaintiff.  The court made no

20  finding as to whether the facts as alleged by the plaintiff actually created a hostile work

21  environment.

22      Further, the conduct at issue in *Draper* was significantly more severe and pervasive than the

23  conduct at issue here.  In *Draper*, over a two year period, the plaintiff's supervisor frequently made

24  explicit and direct sexual statements about the plaintiff to her personally, to her co-workers, and

25

23

over the loudspeaker at their job site.  In contrast, here, Plaintiff's supervisor repeatedly referred to another female management-level DPS employee in demeaning terms and once made an inappropriate comment to Plaintiff about his penis.  In addition, DPS allegedly permitted NHP to boycott the Academy after Wine made an inappropriate comment to Plaintiff.  While McAfee and Wine's comments and conduct were certainly inappropriate, they simply do not rise to the level of severity or pervasiveness as the harassment at issue in *Draper*.[8]

Because the court finds as a matter of law that the conduct at issue here is not sufficiently severe or pervasive to alter the conditions of Plaintiff's working environment, the court will grant summary judgment on Plaintiff's hostile work environment claim.

IT IS THEREFORE ORDERED that DPS's Motion for Summary Judgment (#31) is GRANTED.

///

///

///

///

///

///

---

[8]Plaintiff also argues that Wine's inappropriate behavior at the "Round Table" held to discuss his conduct was analogous to the laughter and comments the plaintiff in Draper encountered when she confronted her supervisor about his conduct.  However, Plaintiff does not indicate how his behavior was inappropriate beyond noting that he had a "hostile attitude" (PL.'s Opp. (#32) at 18), and a hostile attitude is not analogous to the "laughter and humiliating response" at issue in *Draper*.  *See Draper*, 147 F.3d at 1109.

In addition, the court notes that although Plaintiff testified that in response to her reporting Wine's conduct McAfee laughed and told her to "have a little bit of thick skin," McAfee's response is not nearly as severe as the supervisor's response in *Draper*.  In *Draper*, the plaintiff had repeatedly reported the supervisor's conduct to no avail.  As a last resort, the plaintiff decided to confront her supervisor directly.  Here, when Plaintiff spoke with McAfee, she  had not reported Wine's conduct to anyone in DPS, and when she did, DPS responded immediately.

24

1    IT IS FURTHER ORDERED that DPS's "Motion for Leave to Extend Time and File Late"

2  (#33) is GRANTED.

3    IT IS SO ORDERED.

4    The Clerk of the Court shall enter judgment accordingly.

5    DATED this 14th day of January, 2010.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE